DECISION AND JUDGMENT ENTRY
{¶ 1} Mark Gumm appeals his convictions for three counts of rape and two counts of disseminating materials harmful to juveniles. Gumm contends the court erred in concluding that G.T. was competent to testify as a witness. However, we conclude the trial court did not abuse its discretion when it determined that G.T. was competent to testify for the transcript of G.T.'s competency examination indicates that (1) he was able to receive and recollect impressions of fact, (2) he knew the difference between truth and falsity, and (3) he appreciated the need to be truthful. Gumm also contends the court erred by permitting G.T.'s father to remain in the courtroom during the trial. Although the state initially indicated that it intended to call G.T.'s father as a witness, the record shows that the state never called him to testify. Consequently, if there was any error associated with the court's failure to exclude G.T.'s father from the courtroom, it can only be harmless. Finally, Gumm argues that his convictions are against the manifest weight of the evidence. Having reviewed the trial transcript, we conclude the state presented substantial evidence from which the jury could find that Gumm committed the charged offenses. Thus, we affirm the trial court's judgment.
 {¶ 2} In 1999, Gumm moved in with his cousin William. While living with his cousin, Gumm slept on the living room floor. C.G., William's youngest son, slept in a room of his own. According to C.G., Gumm would come into his room at night and "suck [his] thing." C.G. explained that Gumm would come into the bedroom, pull down C.G.'s underwear, and place C.G.'s "weenie" in his mouth.
 {¶ 3} Subsequently, C.G.'s family moved to a new house and Gumm moved with them. In the new house, C.G. shared a bedroom with one of his brothers. The two slept in a bunk bed with C.G. sleeping on the top bunk. Gumm slept on the floor of the boys' bedroom. According to C.G., Gumm "would suck [his] weenie" almost every night.
 {¶ 4} In 2002, Gumm moved into a house of his own. One day, C.G. and his cousin G.T. went to Gumm's house to watch a movie. Gumm, C.G., and G.T. watched the movie in the downstairs living room. Afterwards, the two boys went upstairs to watch a second movie. While the boys were watching the second movie, Gumm asked G.T. to come downstairs. G.T. indicated that when he and Gumm got downstairs, Gumm took all of his clothes off and made G.T. "suck his pete".
 {¶ 5} In July 2002, Gumm took twelve-year old M.H. fishing at the Scioto River. Later, Gumm and M.H. went back to Gumm's house to work on a motorbike. At the house, Gumm took off all of his clothes. He then began watching a video that showed a man and a woman engaging in oral sex. M.H. indicated that he was about ten feet from Gumm while the video was playing.
 {¶ 6} That same summer, Gumm brought ten-year old R.K. to his house to throw a baseball. After throwing the ball for awhile, Gumm and R.K. went inside to watch a movie. Gumm put in a video that showed a man and a woman having sexual intercourse. He then asked R.K. if he wanted to play a game called "you do something to me and I do something to you". At that point, R.K. asked to be taken home. Before taking R.K. home, Gumm told R.K. that he had to promise not to tell.
 {¶ 7} In December 2002, the grand jury indicted Gumm on three charges of rape in violation of R.C. 2907.02, one count of gross sexual imposition in violation of R.C. 2907.05, and two counts of disseminating materials harmful to juveniles in violation of R.C.2907.31. Gumm pled not guilty and the case proceeded to trial. After both sides presented their case, defense counsel moved for a judgment of acquittal on the gross sexual imposition charge. The state offered no objection and the trial court granted the motion. At the conclusion of the trial, the jury found Gumm guilty of the remaining counts of the indictment. Subsequently, the court sentenced Gumm to nine years in prison for each of the rape counts, the sentences to run consecutively. The court also sentenced Gumm to six months in prison on each count of disseminating materials harmful to juveniles. The court ordered those sentences to be served consecutive to each other but concurrent with the sentences imposed for the rapes. Gumm now appeals and raises the following assignments of error: "ASSIGNMENT OF ERROR NO. 1 — The trial court erred to the prejudice of appellant in not conducting an adequate competency hearing and in finding [G.T.] competent to testify. ASSIGNMENT OF ERROR NO. 2 — The trial court erred to the prejudice of appellant in its improper application of evidentiary rule 615 in failing to require [G.T.]'s father, also a witness, to be removed from the courtroom. ASSIGNMENT OF ERROR NO. 3 — The trial court erred to the prejudice of appellant when it entered judgment of conviction on all counts of the indictment where such judgment was against the manifest weight of the evidence."
 {¶ 8} In his first assignment of error, Gumm contends the court erred in concluding that G.T. was competent to testify as a witness. He argues that the court failed to question G.T. about events occurring around the same time period as the alleged sexual abuse. In addition, Gumm contends the court erred by not allowing defense counsel to participate in G.T.'s competency examination.
 {¶ 9} Evid.R. 601(A) provides: "Every person is competent to be a witness except * * * children under ten years of age, who appear incapable of receiving just impression of the facts and transactions respecting which they are examined, or of relating them truly." When presented with a child witness under the age of ten, the trial court must conduct a voir dire examination to determine whether the child is competent to testify. State v.Frazier (1991), 61 Ohio St.3d 247, 250-51, 574 N.E.2d 483. The determination of competency is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. State v. Allard, 75 Ohio St.3d 482, 496,1996-Ohio-208, 663 N.E.2d 1277; State v. Clark,71 Ohio St.3d 466, 479-80, 1994-Ohio-43, 644 N.E.2d 331. An abuse of discretion consists of more than an error of law or judgment; it connotes an attitude on the part of the court that is unreasonable, unconscionable, or arbitrary. State v. Myers,97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, at ¶ 75; State v. Adams
(1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.
 {¶ 10} In Frazier, supra, the Supreme Court of Ohio established a test for determining whether a child under the age of ten is competent to testify. Under that test, the trial court must consider the following factors: "(1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful."Frazier, 61 Ohio St.3d 247, syllabus.
 {¶ 11} G.T. was seven years old at the time of the trial. He knew his full name and age and the names and ages of his two younger sisters. G.T. was able to name the people that lived with him and explain that Lisa was "going to be [his] stepmom". Although G.T. did not know what city he lived in, he knew his street address. In addition, he knew what school he attended, what grade he was in, and who his teacher was. Furthermore, G.T. knew where he attended school the previous year, what grade he had been in, and who his teacher had been. G.T. was also able to name his favorite present from the Christmas before. Finally, G.T. knew the difference between the truth and a lie. G.T. indicated that telling a lie meant to "tell something that ain't true." He also indicated that when you lie, "you usually get in trouble".
 {¶ 12} Gumm argues that the court failed to question G.T. about events occurring around the same time period as the alleged sexual abuse. He argues that the trial court was unable to determine if G.T. had any recollection of events occurring during the same time period. However, the transcript of the examination indicates that G.T. was able to perceive and recollect past events. As noted, G.T. knew what school he attended the previous year and who his teacher had been. In addition, G.T. was able to name his favorite present from the previous Christmas. While G.T. could not answer all of the questions asked of him, the transcript of the examination indicates that he was able to receive, recollect, and communicate impressions of fact. SeeState v. Said, 71 Ohio St.3d 473, 476, 1994-Ohio-402,644 N.E.2d 337. Moreover, the transcript reveals that G.T. understood the difference between truth and falsity and that he appreciated the need to be truthful. See Frazier, 61 Ohio St.3d at 251. Accordingly, we conclude the trial court did not abuse its discretion in determining that G.T. was competent to testify.
 {¶ 13} Gumm also argues that the court erred by not allowing defense counsel to participate in G.T.'s competency examination. Both Gumm and his defense counsel were present in the courtroom during the examination. However, the trial judge indicated that he would conduct the voir dire examination without the assistance of counsel. Defense counsel objected to not being able to participate in the competency examination.
 {¶ 14} In State v. Wilson (1952), 156 Ohio St. 525, 529,103 N.E.2d 552, the Supreme Court of Ohio stated: "When the child is presented in court and the fact is revealed that the age of ten has not been reached, it is the duty of the trial judge toimmediately examine the child, without the participation orinterference of counsel, to determine the child's competency to testify." (Emphasis added.) Thus, we conclude the trial court did not err in refusing to allow counsel to participate in the voir dire examination. See State v. Bunch (1989),62 Ohio App.3d 801, 805, 577 N.E.2d 681
(Holding that the trial judge must voir dire the child "without interruption from counsel."); State v. Workman (1984),14 Ohio App.3d 385, 389, 471 N.E.2d 853
(Holding that "it was the role of the trial court, not counsel, to determine that the witnesses were competent to testify" and that counsel "properly played no role in the examination of the witnesses.") Because the trial court did not abuse its discretion in finding G.T. competent to testify, Gumm's first assignment of error lacks merit.
 {¶ 15} In his second assignment of error, Gumm argues that the court erred by allowing a witness to remain in the courtroom. Specifically, he claims that the trial court erred by permitting G.T.'s father to remain in the courtroom during the trial.
 {¶ 16} Evid.R. 615 requires the court to order the separation of witnesses if either party so requests. "The purpose of a separation order is `so that [witnesses] cannot hear the testimony of other witnesses,' Evid.R. 615, and tailor their own testimony accordingly." State v. Waddy (1992),63 Ohio St.3d 424, 434, 588 N.E.2d 819.
 {¶ 17} Before the trial began, defense counsel moved for a separation of witnesses. The trial court granted the motion and ordered all persons that would be testifying in the trial to leave the courtroom. The following discussion then took place: "COURT: * * * There has also been a discussion I believe concerning the father of one of the alleged victims remaining in the courtroom. STATE: Yes. That would be the father of [G.T.] COURT: I understand that Mr. [T.], Senior's testimony is going to be very limited, am I correct? STATE: It will, your honor. COURT: As we discussed, I think that was just date of birth, am I correct? STATE: Yes, your honor. COURT: As long as Mr. [T.]'s testimony is solely to that issue and nothing else, I'll permit him to remain. DEFENSE: Would the court note my objection?"
 {¶ 18} Under prior Ohio law, the trial court had discretion to determine whether a witness should be excluded. See 1980 Staff Note to Evid.R. 615. Evid.R. 615(A), however, mandates the separation of witnesses upon a party's request unless the witness concerned fits within one of the exceptions identified in Evid.R. 615(B). See Evid.R. 615. Because there is no evidence that the court found G.T.'s father fit within one of the exceptions in Evid.R. 615(B), he should have been excluded from the courtroom. Thus, the trial court erred in excepting G.T.'s father from its separation order. However, we conclude the error is harmless. Although the state indicated before the trial began that it intended to call G.T.'s father as a witness, the record reveals that the state never called him to testify. Because G.T.'s father did not actually testify at the trial, any error associated with the court's failure to exclude him from the courtroom is harmless. Accordingly, we conclude that Gumm's second assignment of error lacks merit.
 {¶ 19} In his third assignment of error, Gumm argues that his convictions are against the manifest weight of the evidence. Although his assignment of error refers to all five of his convictions, Gumm's argument only addresses two of his convictions, i.e., the rape conviction involving G.T. and one of the rape convictions involving C.G. Technically, we need only address those convictions for which Gumm has posited arguments. See App.R. 16(A)(7). However, in the interests of justice, we will address all five of Gumm's convictions.
 {¶ 20} Our function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52, 678 N.E.2d 541. In order to undertake this review, we must sit as a "thirteenth juror" and review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. Id., citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. If we find that the fact finder clearly lost its way, we must reverse the conviction and order a new trial. Id. We will not reverse a conviction so long as the state presented substantial evidence for a reasonable trier of fact to conclude that all of the essential elements of the offense were established beyond a reasonable doubt. State v.Getsy, 84 Ohio St.3d 180, 193-94, 1998-Ohio-533, 702 N.E.2d 866;State v. Eley (1978), 56 Ohio St.2d 169, 383 N.E.2d 132, syllabus. In conducting our review, we are guided by the presumption that the jury "is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of proffered testimony." Seasons Coal v. Cleveland (1984), 10 Ohio St.3d 77,80, 461 N.E.2d 1273.
 {¶ 21} The jury convicted Gumm of three counts of rape in violation of R.C. 2907.02(A)(1)(b), which provides: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * the other person is less than thirteen years of age * * *." Sexual conduct includes, among other things, "fellatio * * * between persons regardless of sex * * *." R.C. 2907.01(A).
 {¶ 22} G.T. was seven years old when he testified at trial. G.T. testified that he and C.G. went to Gumm's house to watch the movie Shrek. After watching Shrek, G.T. and C.G. went upstairs to watch the movie Water Boy. G.T. testified that while they were watching Water Boy, Gumm "came upstairs and got me." He testified that Gumm told C.G. to stay upstairs and that he and Gumm went downstairs to the front room. G.T. testified that when they got downstairs, Gumm "took all of his clothes off." According to G.T., Gumm made G.T. "suck his pete." He testified that Gumm grabbed a hold of his head and "pushed it down there." G.T. testified that Gumm's "pete" was "hairy". According to G.T., he "got away from [Gumm]" and told Gumm that he "didn't want to do it." G.T. then went back upstairs. C.G. also testified about the incident involving G.T. He testified that while he was watching Water Boy, G.T. was downstairs for about ten or fifteen minutes. C.G. testified that when G.T. came back upstairs, "he licked his lips."
 {¶ 23} At the time of the trial, C.G. was ten years old. C.G. testified that he and his family used to live on Hanna Lane and that Gumm lived with them there. C.G. indicated that he slept in his own room but that Gumm slept on the living room floor. According to C.G., Gumm would come into his room at night and suck his "weenie". He explained that Gumm would pull his underwear down and put C.G.'s "weenie" in his mouth. Although C.G. did not know how many times this happened, he testified that it happened more than once.
 {¶ 24} When C.G. was nine, his family moved to Bowen Lane and Gumm moved with them. C.G. testified that he shared a room with one of his older brothers in the new house. He indicated that they slept in bunk beds and that he slept on the top bunk. Gumm slept on the floor in C.G.'s room. According to C.G., Gumm "did the same stuff that he did at Hanna Lane." C.G. explained that Gumm would suck his "weenie" almost every night. C.G.'s father William also testified at the trial. He corroborated C.G.'s testimony regarding the sleeping arrangements at the Hanna Lane and Bowman Lane residences.
 {¶ 25} At trial, Gumm testified in his own defense. He testified that he knew both C.G. and G.T. However, he denied engaging in sexual activity with either of the boys. Moreover, he testified that he had never taken his clothes off in front of either G.T. or C.G. Gumm testified that both boys were lying about the sexual abuse. According to Gumm, the boys' parents were making it up to get back at him.
 {¶ 26} Having reviewed the evidence, we cannot say that the jury clearly lost its way when it convicted Gumm of three counts of rape. Gumm argues that C.G.'s testimony about the incidents at Bowman Lane is not credible. He states: "To believe [C.G.]'s testimony, the jury would have to believe that Mark Gumm stood next to the bunk bed on several occasions, and molested the child while the child's older sibling lay sleeping on the bunk bed below. Not once was the older child awakened." However, neither party called C.G.'s brother as a witness. Thus, we do not know whether C.G.'s brother saw or heard anything. Moreover, G.C.'s account of the incident is not so far-fetched that it is unbelievable. It is conceivable that Gumm sexually abused C.G. while his brother was in the room.
 {¶ 27} Gumm also argues that G.T.'s testimony was not credible. He argues that G.T. did not have the capability to recollect the event in such detail. Gumm argues that G.T.'s testimony "was clearly the result of practice and repetition." However, G.T.'s testimony does not appear to be coached or rehearsed. Moreover, there is no indication that the answers G.T. gave were not his own.
 {¶ 28} The testimony of G.T. and C.G. establishes that Gumm raped them. Gumm, on the other hand, denies having any sexual contact with the boys. The weight of the evidence and credibility of witnesses are issues for the jury as the trier of fact. Statev. DeHass (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212; Statev. Antill (1964), 176 Ohio St. 61, 67, 197 N.E.2d 548. A jury is free to believe all, some, or none of a particular witness's testimony. Antill. See, also, State v. Caldwell (1992),79 Ohio App.3d 667, 679, 607 N.E.2d 1096. Clearly, the jury chose to believe the testimony of C.G. and G.T. We cannot say that in doing so the jury created a manifest miscarriage of justice. Because the state presented substantial evidence from which the jury could find that Gumm committed the three rapes, we conclude his convictions are not against the manifest weight of the evidence.
 {¶ 29} The jury also convicted Gumm of two counts of disseminating materials harmful to juveniles in violation of R.C.2907.31(A)(3), which provides: "(A) No person, with knowledge of its character or content, shall recklessly do any of the following * * * (3) Allow any juvenile to review or peruse any material or view any live performance that is harmful to juveniles.[1]" Under R.C. 2901.22(C), a person acts recklessly when "with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature."
 {¶ 30} Material includes, among other things, a "motion picture film" or "other tangible thing capable of arousing interest through sight, sound, or touch." R.C. 2907.01(J). Material is harmful to juveniles if "it is offensive to prevailing standards in the adult community with respect to what is suitable for juveniles, and * * * (2) it contains a display, description, or representation of sexual activity, masturbation, sexual excitement, or nudity * * *." R.C. 2907.01(E)(2).
 {¶ 31} At trial, Gumm's cousin William testified that he used to own pornographic movies. He testified that they were "sex movies" that showed males and females engaged in oral sex and sexual intercourse. William also testified that he used to own a blow-up doll. According to William, he gave the pornographic movies and blow-up doll to Gumm when he moved out.
 {¶ 32} R.K. was twelve years old at the time of the trial. R.K. testified that he went to Gumm's house to throw a baseball. After throwing the ball for five or ten minutes, Gumm and R.K. went inside to watch a movie. R.K. testified that he thought they were going to watch Water Boy since the videocassette was lying near the VCR. However, Gumm put in a movie that showed a man and a woman having sex. R.K. testified that the man in the movie was putting his penis inside the woman. While they were watching the movie, Gumm asked R.K. if he wanted to play a game. When R.K. asked Gumm what kind of game, Gumm answered "you do something to me and I do something to you". R.K. said no and told Gumm that he wanted to go back downstairs. Before taking R.K. home that day, Gumm told R.K. that he had to promise not to tell.
 {¶ 33} At the time of the trial, M.H. was thirteen years old. He testified that he went fishing with Gumm at the Scioto River. According to M.H., Gumm took off his clothes while they were fishing at the river. When they were done fishing, Gumm and M.H. went back to Gumm's house to work on a motorbike. M.H. testified that while he was working on the bike upstairs, Gumm took off his clothes. M.H. testified that Gumm was lying on the floor in a room about ten feet from where M.H. was working on the motorbike. According to M.H., the room contained a television, a bed, and a blow-up doll that looked like a naked woman. M.H. testified that Gumm started watching a "bad movie" that showed people "having sex". M.H. testified that he saw the woman in the movie place the man's penis in her mouth. According to M.H. the movie was on for about fifteen minutes before his father arrived.
 {¶ 34} M.H.'s father, Tim, testified that Gumm took his son fishing in July 2002. He testified that Gumm and M.H. left at around 7:30 or 8:00 p.m. When they weren't home by 11:00 p.m., Tim went out looking for them. Eventually, he located them at Gumm's house. When Tim arrived at Gumm's house, he tried to open the door but it was locked. After his son answered the door, Tim went upstairs to talk to Gumm. According to Tim, Gumm was only wearing a pair of jeans. Tim testified that he saw "porno film cases laying out in the open" and a "blow-up sex doll laying on the floor".
 {¶ 35} As noted, Gumm testified in his own defense. He testified that he knew both R.K. and M.H. In addition, he acknowledged that he and M.H. had gone fishing together and then gone back to his house. However, he testified that they went to the house to get something for Tim and "by the time I went in the house to grab it, then Tim came down and picked [M.H.] up." Gumm testified that William Gumm never gave him pornographic films or a blow-up sex toy. He further testified that he did not have pornographic films or blow-up dolls in his house. Finally, Gumm denied showing pornographic movies to R.K. and M.H.
 {¶ 36} Gumm's brother, Bruce, also testified on his behalf. Bruce testified that he visited his brother in June 2002. Bruce testified that he spent about a half hour at his brother's house and that Gumm showed him through all the rooms of the house. Bruce testified that he did not see any pornographic materials in the house. He testified that his view of the house was such that he would have noticed any pornographic materials if they were visible. On cross-examination, Bruce acknowledged that he did not look in any of the drawers or cabinets at his brother's house. He also acknowledged that he did not look under the bed or in any boxes in the closets.
 {¶ 37} After reviewing the evidence, we cannot say that the jury lost its way and created a manifest miscarriage of justice. Both R.K. and M.H. testified that Gumm watched pornographic movies in their presence. Moreover, M.H.'s father testified that he noticed pornographic film cases lying on the floor when he picked his son up from Gumm's house. Although Gumm denied owning pornographic materials, the jury was free to disbelieve his testimony. See Antill, supra. Moreover, the jury was free to disbelieve Gumm when he denied showing dirty movies to R.K. and M.H. See Id. Because the state presented substantial evidence from which the jury could find Gumm guilty, we conclude that his convictions for disseminating matters harmful to juveniles are not against the manifest weight of the evidence. Accordingly, we overrule Gumm's third assignment of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that the Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Kline, P.J. Abele, J.: Concur in Judgment and Opinion.
[1] All statutory references are to the 2002 versions since Gumm committed these crimes in 2002.